# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **HUBERT ANTHONY SALYER,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 2:22cv00025 |
| | ) | **REPORT AND** |
| **MARTIN J. O'MALLEY,**[1] | ) | **RECOMMENDATION** |
| **Commissioner of Social Security,** | ) | |
| Defendant | ) | By:    PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

## *I. Background and Standard of Review*

Plaintiff, Hubert Anthony Salyer, ("Salyer"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). Neither party has requested oral argument; therefore, this case is ripe for decision.  As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d

---

[1] Martin J. O'Malley, ("O'Malley"), became the Commissioner of Social Security on December 20, 2023.  Pursuant to Federal Rules of Civil Procedure Rule 25(d), O'Malley should, therefore, be substituted for Kilolo Kijakazi as the defendant in this case.  Pursuant to the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), no further action is required to continue this suit.

514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Salyer protectively filed his application for DIB on May 4, 2020, alleging disability as of November 25, 2019, based on a back injury; numbness in the feet and legs; sharp pain in the right leg and back; and a fracture at the L4-L5 area of the back. (Record, ("R."), at 13, 266-67, 298, 336.) The claim was denied initially and upon reconsideration. (R. at 136-48, 152-55.) Salyer then requested a hearing before an administrative law judge, ("ALJ"). (R. at 160-61.) The ALJ held a hearing on November 18, 2021, at which Salyer was represented by Jennifer Morgan, a nonattorney representative. (R. at 53-77.) Thereafter, the ALJ held a supplemental hearing on March 16, 2022, at which Salyer, again, was represented by Morgan. (R. at 78-101.)

By decision dated March 30, 2022, the ALJ denied Salyer's claim. (R. at 13-26.) The ALJ found that Salyer meets the nondisability insured status requirements of the Act for DIB purposes through December 31, 2024.[2] (R. at 15.) The ALJ found that Salyer had not engaged in substantial gainful activity since November 25, 2019, the alleged onset date. (R. at 15.) The ALJ determined that Salyer had severe impairments, namely lumbar spine disorder following a work injury, requiring

---

[2] Therefore, Salyer must show that he was disabled between November 25, 2019, the alleged onset date, and March 20, 2022, the date of the decision, to be eligible for benefits.

multiple surgeries; post-laminectomy syndrome; lumbar degenerative disc disease/degenerative joint disease; inguinal hernia with repair surgery; and hypertension, but he found that Salyer did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15-18.) The ALJ found that Salyer had the residual functional capacity to perform sedentary[3] work, except he could not crawl or climb ladders or scaffolds; he could occasionally stoop, crouch and kneel; and he requires a cane for ambulation.  (R. at 18.) The ALJ found that Salyer was unable to perform his past relevant work as a miner. (R. at 24.)  Based on Salyer's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Salyer could perform, including those of a final assembler, a finisher and an assembler. (R. at 24-26.) Thus, the ALJ concluded that Salyer was not under a disability as defined by the Act from November 25, 2019, through the date of the decision, and he was not eligible for DIB benefits. (R. at 26.) *See* 20 C.F.R. § 404.1520(g) (2023).

After the ALJ issued his decision, Salyer pursued his administrative appeals, (R. at 263-65, 381-86), but the Appeals Council denied his request for review. (R. at 1-6.) Salyer then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981

---

[3] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally, and other sedentary criteria are met.  *See* 20 C.F.R. § 404.1567(a) (2023).

(2023). This case is before this court on Salyer's motion for summary judgment filed July 10, 2023, and the Commissioner's brief filed September 20, 2023.

## II. Facts[4]

Salyer was born in 1976, (R. at 266), which classifies him as a "younger person" under 20 C.F.R. § 404.1563(c). He has a high school education and past work experience as a coal miner. (R. at 299.) At the November 18, 2021, telephonic hearing, Salyer testified he injured his back after falling while lifting a heavy piece of equipment while working as a coal miner. (R. at 65-66.) He saw Dr. J. Travis Burt, M.D., a neurosurgeon, throughout his Workers' Compensation claim. (R. at 66.) Salyer said Dr. Burt performed two back surgeries, but he continued to have back pain. (R. at 66.) He testified a CT scan showed a fracture, in addition to the same bulging disc Dr. Burt was supposed to have fixed. (R. at 66.) Salyer testified he cannot sit or walk for too long, and he cannot pick his son up or play with him like he used to. (R. at 66.) He stated his foot goes numb, and his "gut starts getting sharp pains." (R. at 66.) Salyer testified Dr. Burt recommended a third surgery, but workers' compensation stopped paying for his medical procedures. (R. at 67.) He testified he was taking oxycodone and gabapentin for pain. (R. at 70.)

When the ALJ noted that Salyer's medical treatment appeared to "drop off" after an emergency department visit approximately 15 months prior to the hearing,[5]

---

[4] Because Salyer's arguments on appeal focus on his physical impairments, the undersigned has limited the discussion of facts to those pertinent thereto.

[5] The ALJ noted that Salyer did continue with pain management at the Simpson Clinic. (R. at 69.) However, this did not appear to consist of treatment, only medication management and drug screening. (R. at 70-71.)

Morgan explained this is when the workers' compensation claim settled,[6] and Salyer had no medical coverage at that point and no way to see Dr. Burt or any other neurosurgeon. (R. at 70.) She further stated that when Salyer recently was hospitalized at Pikeville Medical Center for a hernia, diverticulitis and polyps, a hospital coordinator got him approved for emergency Medicaid because they thought he might need surgery. (R. at 71.) Morgan explained that Salyer currently had temporary Medicaid, which had been effective since he was released from the hospital a couple of weeks previously, but both she and Salyer were unsure whether that coverage was attached only to the medical issues of that hospital stay or if he could use it to see a neurosurgeon. (R. at 71-72.) In any event, the ALJ and Morgan agreed the record was incomplete, as there are no treatment records after Dr. Burt confirmed the functional capacity evaluation, finding that Salyer could perform at least light, if not medium, level of work, which is contrary to the state agency consultants' opinions. (R. at 72-73.) That being the case, the ALJ stated he would order a consultative examination, after which time, another hearing would be held. (R. at 73-74.) The ALJ also asked Morgan to submit the records from Salyer's recent hospitalization. (R. at 75.)

At the March 16, 2022, supplemental hearing, Salyer testified he received a lump-sum workers' compensation settlement of $200,000, which he used to pay off "everything [he] owed," including his home and vehicles. (R. at 86-87.) He stated he did not want to settle, but his former lawyer told him if he did not, she was going to "drop" him. (R. at 85.) He testified he did not use any of the money to get insurance to get the third surgery "because … it was going to cost me more to pay for insurance than I would've been able to make it on." (R. at 87.) Salyer testified

---

[6] Salyer testified his previous lawyer told him if he did not take what was being offered to settle the workers' compensation claim, she was going to "drop" him. (R. at 76.)

that he never returned to work after the November 25, 2019, mining accident and that neither of the surgeries "really gave [him] any benefit," as he remained in pain. (R. at 88-89.) He stated he also had tried three courses of physical therapy and an epidural steroid injection, none of which helped. (R. at 89.) In fact, Salyer testified the physical therapy made his back hurt worse. (R. at 89.) Salyer testified workers' compensation sent him for a functional capacity evaluation, during which he was made to pick up boxes, and this caused his back to hurt. (R. at 90.) He said he heard something pop, and his back continued to hurt worse. (R. at 90.) Salyer stated Dr. Burt told him he could not be hurting, but he went to the emergency department at Norton Community Hospital, where a CT scan was performed, showing the original bulging disc, an additional one and a fracture. (R. at 90.) Salyer testified that when he returned to Dr. Burt in August 2020 with these CT findings, he told Salyer he needed a third surgery, during which he would place screws in his back. (R. at 90, 92-93.) He stated he had not seen Dr. Burt or any other neurosurgeon since this time. (R. at 93.) Salyer testified he required a cane to stand and walk anytime he left his home since the accident due to back pain and his right leg giving way. (R. at 93-94.) He stated this same pain and numbness had existed since the day of the work injury. (R. at 94.) Salyer testified he had been limited to lifting no more than 20 pounds since undergoing hernia surgery. (R. at 94-95.) However, he stated he was afraid to find out whether he could lift 20 pounds with one arm. (R. at 95.) Salyer testified he could sit for 30 to 40 minutes before having back and foot pain, requiring him to lie down. (R. at 95.) He stated that, although he was taking two medications and had been compliant with his doctors' orders and advice, his blood pressure was not controlled, partly due to pain. (R. at 95-96.)

Diana Sims, a vocational expert, also was present and testified at Salyer's hearing.  (R. at 97-100.)  She classified his past work as a miner as very heavy[7] and skilled.  (R. at 97.)  When Sims was asked to consider a hypothetical individual of Salyer's age, education and work history, who could perform sedentary work, with no more than occasional stooping, crouching or kneeling; and no crawling or climbing of ladders or scaffolds, she testified that such an individual could perform jobs existing in significant numbers in the national economy, including those of a final assembler, a finisher and an assembler.  (R. at 97-98.)  Sims further testified these jobs required no public interaction or more than occasional interaction with others, such as co-workers or supervisors.  (R. at 98-99.)  Sims also testified that, because these jobs were sedentary, they could be performed by an individual required to use a cane, even if that individual had to walk and carry small objects in one hand.  (R. at 99.)  When asked to consider the same hypothetical individual, but who could lift up to 10 pounds occasionally, sit for a total of 30 minutes, stand for a total of 30 minutes and walk for a total of two hours, Sims testified such an individual could not perform full-time work.  (R. at 99.)  She testified that a sedentary job can require an individual to stand/walk up to two hours.  (R. at 100.)  Sims stated that a limitation of no repetitive bending or stooping would not change any of her prior testimony.  (R. at 100.)  Lastly, Sims testified that, if an individual were unpredictably and continually absent 19 times over the course of a year, he could not sustain competitive employment.[8]  (R. at 100.)

---

[7] Very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.  If someone can do very heavy work, he also can do heavy, medium, light and sedentary work.  *See* 20 C.F.R. § 404.1567(e) (2023).

[8] This hypothetical question was based on Salyer's physical therapy appointments.  (R. at 100-01.)

In rendering his decision, the ALJ reviewed records from Richard J. Milan, Jr., Ph.D., a state agency psychologist; Dr. Donald Williams, M.D., a state agency physician; Howard Leizer, Ph.D., a state agency psychologist; Dr. Jack Hutcheson, M.D., a state agency physician; Mountain States Rehab Services; Norton Community Hospital; Highlands Neurosurgery, PC; Bristol Regional Medical Center; Psychological Consulting Services; Lonesome Pine Hospital; Wellmont Medical Associates; Ballad Health Medical Associates Family Medicine; Kingsport Endoscopy Corporation; Gastroenterology Associates; Simpson Clinic, LLC; Alan Meade, P.T., D.Sc.P.T., a physical therapist; Russell County Medical Center; Pikeville Medical Center; and Southern Medical Group, Inc.

The record shows that Salyer presented to the emergency department at Norton Community Hospital on November 25, 2019, for burning and sharp lower back and right hip pain after lifting a heavy object at work and falling. (R. at 548, 550.) He stated he could not put pressure on his leg. (R. at 550.) X-rays of the lumbar spine showed no acute fracture or malalignment, but mild spurring at the L3-L4 and L4-L5 levels. (R. at 545.) X-rays of the right hip also showed no fracture or malalignment. (R. at 547.) Salyer was diagnosed with right hip pain and right lower back pain and discharged home in stable condition. (R. at 555.) He returned to the emergency department the following day with continued complaints of right lower back pain radiating into the right hip and right leg. (R. at 536, 538.) Salyer's blood pressure was 161/99 at that time. (R. at 538.) He had extreme pain with movement of the right leg and severe back spasm. (R. at 542.) A CT scan of the lumbar spine and pelvis showed no evidence of acute fracture; shallow disc bulges at the L3-L4, L4-L5 and L5-S1 levels; mild right neural foraminal narrowing at the L3-L4 level; mild spinal canal narrowing and moderate left and mild to moderate right neural foraminal narrowing at the L4-L5 level; mild left and moderate right neural

foraminal narrowing at the L5-S1 level; no acute pelvic fracture; and a large fat-containing hernia with no bowel content.  (R. at 530-34.)  He was diagnosed with sciatica; sacroiliitis; disc bulges; and an inguinal hernia.  (R. at 542.)  On December 3, 2019, he, again, presented to the emergency department with complaints of constant low back pain that radiated up his back, with associated numbness and tingling, preventing him from working.  (R. at 525.)  He reported that prescription medications helped his symptoms, and he needed an MRI.  (R. at 525.)  Salyer had paraspinal muscle tenderness.  (R. at 526.)  He was diagnosed with acute lumbosacral sprain, and the provider stated Salyer needed a lumbar MRI to definitively rule out other acute injury.  (R. at 526.)  He was prescribed Naproxen and given a work note until he could have the MRI done and be cleared to return to work.  (R. at 526.)

On December 4, 2019, Salyer saw Dr. James W. Campbell, D.O., his primary care provider at Wellmont Medical Associates, for a hospital discharge follow up after multiple emergency department visits.  (R. at 1006-07.)  Salyer stated he continued to have back pain with radiation, especially with standing for any length of time, bending or prolonged sitting. (R. at 1006-07.)  He reported he could not rest due to the discomfort, but did get some relief with pain medication from the emergency department.  (R. at 1006.)  Salyer complained of arthralgias, back pain and sleep disturbance. (R. at 1008.) On examination, his blood pressure was 150/76; he was fully oriented; he had decreased range of motion, pain and spasm of the lumbar back; and he had tenderness with palpation and radiation down the right leg with standing, sitting and bending.  (R. at 1008.)  Dr. Campbell diagnosed back pain with right-sided radiculopathy, prescribed a steroid and Relafen and ordered an MRI. (R. at 1009.)

Salyer saw Dr. J. Travis Burt, M.D., a neurosurgeon with Highlands Neurosurgery, PC, on December 10, 2019, as a new workers' compensation referral. (R. at 598.)  His chief complaint was back and right lower extremity pain.  (R. at 598.)  Dr. Burt recounted the history of Salyer's injury and stated he had failed to gain relief to date, despite treatment with multiple modalities.  (R. at 598.)  He also noted no imaging of the lumbar spine had been performed.  (R. at 598.)  On examination, Salyer's blood pressure was 169/114; there was no specific tenderness over the facet joints, sacroiliac, ("SI"), joints or greater trochanteric bursa; Patrick's maneuver was unremarkable, but reproduced some back pain; straight leg raise testing was positive on the right; sensory exam was intact to pin prick; and there might have been some diminution of the right Achilles reflex, but, otherwise, it was symmetric.  (R. at 599.)  Salyer rated his pain as a six on a 10-point scale.  (R. at 599.)  Dr. Burt diagnosed low back pain, noting his symptom complex sounded like an SI radiculopathic process, and he ordered a lumbar MRI.  (R. at 599.)  He advised Salyer to remain off work until he returned to see him.  (R. at 599.)

The lumbar MRI, performed on December 17, 2019, showed scattered degenerative changes within the lower lumbosacral spine, most significantly affecting the L5-S1 level.  (R. at 1000, 1222-23.)  When Salyer saw Dr. Burt that same day, to follow up on the MRI, he reported his condition may have improved a little since his prior visit.  (R. at 594.)  Dr. Burt requested a lumbar epidural steroid injection to see if it would benefit Salyer.  (R. at 594-95.)  Dr. William Platt, M.D., administered a right L5-S1 interlaminar epidural steroid injection on January 23, 2020, which Salyer tolerated well.  (R. at 593.)  However, when Salyer returned to Dr. Burt on February 4, 2020, he reported no significant benefit from the injection. (R. at 591.)  Thus, Dr. Burt discussed performing a surgical decompression, which Salyer wished to pursue.  (R. at 591.)  He diagnosed intervertebral disc disorder with

radiculopathy of the lumbosacral region, and he scheduled Salyer for a right L5-S1 lumbar laminectomy and disckectomy, which he performed on February 24, 2020, without complication. (R. at 585-86, 592, 1001-02.) Salyer was instructed not to lift over 10 pounds; not to climb or bend; to work on ground level; and to walk further and longer each day to help with post-operative discomfort. (R. at 1005.)

At follow up on March 6, 2020, Dr. Burt noted Salyer was not doing a whole lot and was lying in bed. (R. at 583.) Although he reported right leg pain, Dr. Burt characterized it as numbness more than anything else. (R. at 583.) Dr. Burt stated he discussed with Salyer the need to begin walking in order to recover, but he continued a no lifting restriction. (R. at 583-84.) Salyer's wound looked good, and straight leg maneuvers were unremarkable. (R. at 584.) On March 24, 2020, Salyer continued to complain of right leg pain, but he stated he had been walking more. (R. at 581.) Straight leg raise testing was equivocally positive, and Salyer complained of burning pain in his right calf. (R. at 582.) He rated his pain as a seven, and Dr. Burt intended to ask for a lumbar myelogram with a post-myelogram CT scan, in addition to an EMG nerve conduction study of the right lower extremity. (R. at 582.) Dr. Burt instructed Salyer to remain off work. (R. at 582.) The CT myelogram was performed on March 25, 2020, and showed post-operative changes on the right at L5-S1 with generalized annular bulging; and a borderline developmentally small central canal, which would predispose Salyer to spinal stenosis with any superimposed degenerative changes; mild relative central canal stenosis at the L4-L5 level associated with degenerative and congenitally small central canal; and minor broad-based annular bulging at the L3-L4 level. (R. at 1025-26, 1219-21.) Dr. Platt performed the EMG and nerve conduction study on March 27, 2020, which he described as being "very mildly abnormal." (R. at 575-78.) Specifically, it showed a very mild axonal injury in an S1 distribution; and no evidence of a frank,

severe radiculopathy, plexopathy, generalized peripheral neuropathy or focal entrapment or injury of a peripheral nerve. (R. at 576.) Salyer saw Dr. Burt that same day, rating his pain as a seven. (R. at 573-74.) Dr. Burt noted that the diagnostic studies demonstrated some decreased filling of the right S1 nerve root, which he strongly felt was post-operative changes versus a recurrence. (R. at 573.) He prescribed gabapentin and a three-week course of physical therapy. (R. at 574.)

Salyer attended physical therapy at Mountain States Rehab Services from March 30 to April 17, 2020. (R. at 687-722.) At his initial assessment, Michael Hensley, D.P.T., a physical therapist, found limitations in gait, proprioception, range of motion and strength. (R. at 689.) Salyer scored 23/45 on the Oswestry Disability Index, ("ODI"), resulting in a disability rating of 51.1 percent.[9] (R. at 688.) Over this time, Salyer rated his pain as between a seven and eight, and he reported no improvement in his pain. (R. at 687-722.) On April 17, 2020, Hensley noted Salyer continued to have severe low back and right lower extremity pain, and he reported no improvement with therapy. (R. at 722.)

Salyer returned to Dr. Burt on April 21, 2020, after finishing physical therapy. (R. at 571.) He reported continued pain along the S1 distribution which was no better or worse. (R. at 571.) Dr. Burt noted "faint" findings on myelogram and post-myelogram CT, as well as nerve studies, but given Salyer's subjective complaints of pain, he stated he could consider re-exploration of the nerve root in the form of a "re-do diskectomy," which Salyer wished to pursue. (R. at 571-72.) Dr. Burt

---

[9] The ODI is a patient-completed questionnaire which gives a subjective percentage score of level of function (disability) in activities of daily living in those rehabilitating from low back pain. It is considered one of the best accepted tools for assessment of low back pain. *See* www.physio-pedia.com/Oswestry_Disability_Index (last visited Mar. 11, 2021).

discontinued physical therapy and increased Salyer's gabapentin dosage.  (R. at 572.)

On May 7, 2020, Dr. Burt performed a second right L5-S1 lumbar laminectomy and diskectomy for a recurrent herniated disc, noting the recent imaging, showing a recurrent disc protrusion with stenosis of the right L5-S1, and that Salyer had failed conservative treatment and medical management, with a pain level of seven out of 10.  (R. at 566-67, 991, 993-96.)  There were no surgical complications, and Salyer tolerated the surgery well.  (R. at 994-95.)  He was discharged home with prescriptions for Percocet and Zanaflex.  (R. at 996.)  Salyer was instructed not to lift more than 10 pounds; not to drive for one week; and to walk daily.  (R. at 996.)  On May 15, 2020, Salyer saw Dr. Burt for a one-week post-operative follow up.  (R. at 562.)  He noted that Salyer came in with a walking cane, stating is leg "goes out from under me."  (R. at 562.)  He rated his pain as an eight.  (R. at 563.)  Dr. Burt advised Salyer to walk and move more.  (R. at 563.)

Salyer presented to the emergency department on May 28, 2020, reporting sharp, lower back pain, which began after walking up steps, and which he rated a 10 on a 10-point scale.  (R. at 514.)  A lumbar CT scan showed spondylosis at the L2-L3 through the L4-L5 disc levels; bilateral lateral recess stenosis at the L4-L5 level, secondary to a posterior disc bulge; and a prior right laminectomy at the L5-S1 level.  (R. at 509.)

When Salyer saw Dr. Burt on June 2, 2020, for a follow up, Dr. Burt noted that the findings at the second surgery were "minor at most."  (R. at 560.)  However, Salyer continued to complain of debilitating pain, reporting he went to the emergency department the prior weekend after bending over and experiencing pain.

(R. at 560.)  Salyer stated that a CT scan showed a bulging disc, but Dr. Burt noted the CT findings are those associated with aging and had been documented by Salyer's previous studies.  (R. at 560.)  Straight leg raise testing was unremarkable. (R. at 561.)  Salyer rated his pain as an eight.  (R. at 561.)  Dr. Burt ordered a two-week course of physical therapy[10] for active/passive range of motion of the lumbar spine.  (R. at 561.)

Salyer presented to the emergency department at Russell County Medical Center on June 10, 2020, with complaints of chronic, low back pain with radiation to the right leg and associated numbness, tingling and weakness.  (R. at 1316.)  He noted a history of a herniated disc with multiple surgeries.  (R. at 1316.)  On exam, Salyer's blood pressure was 139/99; he had pain in the lumbar area; painful range of motion with all movement; normal spinal alignment; no muscle spasm; full strength and normal muscle tone in all extremities; normal muscle tone in all extremities; no gross deficits in sensation; and an ataxic gait.  (R. at 1317.)  The provider advised Salyer to follow up with his primary care provider and get a second opinion from a neurologist.  (R. at 1317.)  He was prescribed tramadol.  (R. at 1317.)

Salyer returned to Dr. Campbell on June 19, 2020, for back pain, but he denied numbness and weakness.  (R. at 1110.)  He was very frustrated with his condition, as he had continued to have pain status-post lumbar diskectomy, and Dr. Burt told him he did not hurt.  (R. at 1110.)  Salyer stated he had pain with bending and movement with radiation down the right leg, which limited his ability to do activities of daily living and yard work.  (R. at 1110-11.)  On examination, Salyer's blood

---

[10] These notes reveal that Salyer, again, reported no change in his pain level with physical therapy.  (R. at 601-80, 824-52.)  On June 10 and June 22, 2020, his ODI disability rating was 62.2 percent.  (R. at 646, 825.)

pressure was 160/70; and he had decreased range of motion, pain and spasm of the lumbar back, with tenderness to palpation and radiation down the right leg. (R. at 1112.) Dr. Campbell diagnosed benign essential hypertension; chronic back pain for greater than three months; and radiculopathy of the leg, and he ordered a lumbar MRI. (R. at 1113.) He also suggested getting a second opinion regarding Salyer's continued pain, and he stated he would refer him to another neurosurgeon to determine whether he would benefit from an epidural injection or nerve ablation. (R. at 1113.) Salyer stated he did not want a prescription for pain medication. (R. at 1113.)

When Salyer saw Dr. Burt for a follow up on June 23, 2020, Dr. Burt noted Salyer's physical therapist had advised that Salyer had not made any progress whatsoever, and there was no change in Salyer's complaints or symptoms since his last visit. (R. at 1192.) Dr. Burt did not think additional physical therapy would benefit Salyer, and he intended to seek a functional capacity evaluation. (R. at 1192.) Salyer rated his pain as an eight, and Dr. Burt kept him out of work. (R. at 1193.) He was referred back to physical therapy for a work conditioning program.[11] (R. at 768.)

---

[11] Salyer participated in work conditioning from June 29 to July 17, 2020. (R. at 730-822, 859-979.) Over this time, he continued to exhibit loss of lumbar range of motion. (R. at 769, 924.) Salyer also continued to have complaints of unchanged pain and soreness. (R. at 859, 875, 891, 907, 923, 925, 954, 969.) On June 29, 2020, his ODI disability rating was 62.2 percent, and on July 16, 2020, it was 55.6 percent. (R. at 768-69, 924.) On June 30, 2020, Salyer's blood pressure was very high at 183/121, and several attempts to decrease his blood pressure with walking and hydration were unsuccessful. (R. at 805-06.) He was instructed to see his primary care provider to get clearance to return to work conditioning. (R. at 807.) Salyer did so, but he continued to have elevated blood pressure throughout the remainder of the work conditioning program. (R. at 734-36, 751, 860, 875-76, 892, 925, 954-55, 969-70.) At a re-evaluation on July 16, 2020, Steve Childers, a clinical exercise physiologist, noted Salyer reported no improvement in pain since beginning therapy. (R. at 925.) The following day, Childers noted there had been no improvement with workload over the duration of work conditioning secondary to Salyer's pain. (R. at 908.)

On June 30, 2020, Salyer advised Dr. Campbell he had been to physical therapy, but had to leave when his blood pressure spiked. (R. at 986.) He stated he needed a release to return to therapy. (R. at 986.) Salyer stated this was a new problem that had been gradually worsening and was accompanied by headaches and malaise/fatigue. (R. at 986.) He also reported more consistent low back pain with radiculopathy. (R. at 986.) On exam, Salyer's blood pressure was 150/104; and he had decreased range of motion, pain and spasm of the lumbar back, with tenderness to palpation and radiation down the right leg. (R. at 988.) Dr. Campbell diagnosed uncontrolled hypertension, prescribed lisinopril and recommended dietary changes. (R. at 988-89.) A July 10, 2020, lumbar MRI showed no acute bony changes; mild, congenital small central spinal canal; post-surgical changes on the right side at the L5-S1 level; an asymmetric bulging annulus to the right with facet arthropathy, causing significant right foraminal stenosis at the L5-S1 level; and mild to moderate bilateral foraminal stenosis due to a bulging annulus and facet arthropathy at the L4-L5 level. (R. at 1012-15.) When he returned to Dr. Campbell on July 21, 2020, Salyer's hypertension remained uncontrolled, with associated malaise/fatigue and neck pain. (R. at 983.) Dr. Campbell reported mild improvement with current treatment, but noncompliance with exercise. (R. at 983.) Salyer noted continued back pain and increased blood pressure with physical therapy or any activity. (R. at 983.) On examination, Salyer's blood pressure was 162/94; and he had decreased range of motion and tenderness of the lumbar back. (R. at 985.) Dr. Campbell diagnosed uncontrolled hypertension and added amlodipine to Salyer's medications. (R. at 985.)

On July 20, 2020, Alan Meade, P.T., D.Sc.P.T., a physical therapist at HMG Rehab Services, completed a functional capacity evaluation of Salyer. (R. at 1295-1302.) Salyer completed the musculoskeletal evaluation, but not the material and

nonmaterial handling activities due to elevated blood pressure readings of 142/100, 160/122, 164/120 and 180/122. (R. at 1295, 1297.) Meade proposed Salyer see his primary care provider to get assistance regulating his blood pressure, and he was scheduled to return to complete the evaluation on July 31, 2020. (R. at 1295.) Salyer reported he had just started taking blood pressure medication at the beginning of the month. (R. at 1297.) He reported lumbar pain with occasional left leg aching and right foot numbness, which he rated a seven. (R. at 1297.) Salyer stated walking, extending the lumbar spine, bending, lifting, getting in and out of a vehicle, climbing and lying flat increased his pain, while lying on his side and taking Motrin or Aleve usually decreased his pain. (R. at 1297.) Meade found Salyer gave a fair to good effort during the evaluation, and he opined his activities qualified him for light[12] to medium[13] work. (R. at 1301.) Specifically, Meade found Salyer could exert 30 to 35 pounds of force occasionally, and/or 15 to 17.5 pounds of force frequently and/or 7.5 to 8.75 pounds of force constantly basis to move objects; he could carry 30 pounds for 100 feet; and he could push and pull 60 and 80 pounds occasionally. (R. at 1301.) This was considered a good performance during material handling. (R. at 1301.) Meade stated musculoskeletal findings were essentially unremarkable with some minor muscle weakness in the right hamstrings and hip flexors, but functional, and trunk range of motion showed some deficit in extension and side bending, bilaterally, but strength was normal. (R. at 1301.) Meade recommended Salyer be referred back to Dr. Burt with these findings to establish his work abilities, identify permanent restrictions and potentially participate in an impairment rating process.

---

[12] Light work involves lifting objects weighing up to 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2023).

[13] Medium work involves lifting objects weighing up to 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can perform medium work, he also can perform sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2023).

(R. at 1301.)  He further encouraged Salyer to continue home exercises learned in physical therapy and to participate in post-rehab, if applicable, and a walking routine. (R. at 1301.) Meade recommended assessing Salyer's job status availability at his employer and working with his case manager, physician and employer.  (R. at 1301.)  Meade opined Salyer could occasionally stand, lift five to 35 pounds, push 60 pounds, pull 80 pounds and reach above the shoulders.  (R. at 1301-02.)  He opined Salyer could frequently sit, walk, kneel, lift five pounds, twist/turn and crawl. (R. at 1301-02.)  Meade opined Salyer could rarely climb.  (R. at 1301.)  Finally, he opined Salyer could perform automatic driving, simple grasping with both hands and operation of foot controls.  (R. at 1301.)  Meade opined Salyer could not safely return to work to his regular duty job, although he met some other aspects of the job.  (R. at 1302.)  However, he stated the decision was left to the discretion of the referring physician based on his assessment of the data in the functional capacity evaluation. (R. at 1302.)

When Salyer returned to Dr. Burt on July 28, 2020, after having attended the initial attempt at the functional capacity evaluation, Dr. Burt noted it was complicated by Salyer's elevated blood pressure.  (R. at 1190.)  Dr. Burt also noted a recent lumbar MRI, which did not demonstrate evidence of disc recurrence, although Salyer's complaints of pain had not changed, which he rated as a seven. (R. at 1190-91.)  Salyer walked with marked distress, requiring stability with the walls and desks during the examination, but he walked "with great alacrity out in the parking lot and appeared to get in the car without assistance." (R. at 1191.)  Dr. Burt stated this represented a marked change from Salyer's presentation in the office on that day.  (R. at 1191.)  He noted that Salyer was to follow up with his primary care provider regarding his blood pressure.  (R. at 1190.)  When Salyer saw Dr. Burt on August 5, 2020, after completing the functional capacity evaluation, Dr. Burt noted

the evaluator felt Salyer gave a good effort overall, lifting up to 60 pounds on material handling, but his job required lifting up to 80 pounds.  (R. at 1217.)  Salyer rated his current pain as an eight.  (R. at 1218.)  Dr. Burt released him to return to work activities with the following permanent restrictions: no lifting more than 40 pounds and no repetitive bending or stooping.  (R. at 1218.)  He opined Salyer was at maximum medical improvement, and he would see him on an as needed basis. (R. at 1218.)

Salyer presented to the emergency department at Norton Community Hospital on August 9, 2020, with complaints of low back pain with radiation down the right leg and tingling in the right foot, which worsened after performing a functional exercise test that day.  (R. at 1208.)  On examination, he exhibited lumbar paraspinal muscle tenderness/spasm, without weakness or sensory loss, and he had a normal gait.  (R. at 1209.)  A CT of the lumbar spine showed the previous, partial right laminectomy at L5 with interval development of a fracture of the medial aspect of the lamina towards the base of the spinous process and a left pars interarticularis fracture extending into the superior aspect of the facet joint, which had developed since May 28, 2020.  (R. at 1200-01.)  There also was right posterolateral disc bulging at L5-S1 extending into the right neural exit foramen and minor posterior disc bulging at L4-L5.  (R. at 1201.)  Salyer was diagnosed with lumbar pain with radiculopathy and a new L5 fracture towards the spinous process.  (R. at 1209.) He was referred to a neurosurgeon and advised to take a muscle relaxer and nonsteroidal anti-inflammatory drug, ("NSAID").  (R. at 1209.)

When Salyer returned to Dr. Burt on August 11, 2020, for an evaluation of the right L5-S1 fracture, he rated his pain as an eight.  (R. at 1215.)  On exam, straight leg raise testing was negative, bilaterally, and reflexes were well-preserved.  (R. at

1216.)  Dr. Burt recommended a right L5-S1 transforaminal lumbar interbody fusion, ("TLIF"), and gave Salyer prescriptions for Robaxin and Norco.  (R. at 1216.)  He kept Salyer out of work, pending surgery.  (R. at 1216.)

Salyer was seen for pain management at the Simpson Clinic, LLC, beginning in September 2020.  On September 29, 2020, he described his pain as constant, burning and tingling down the right leg to the plantar aspect of the foot with numbness in the toes.  (R. at 1249.)  Salyer reported increased symptoms with walking and standing, and he stated gabapentin did not provide relief, while Lortab, Percocet and tramadol provided minimal relief.  (R. at 1249.)  He reported good sleep with trazodone.  (R. at 1249.)  Salyer denied side effects from his current pain medications, which relieved his pain by 10 percent.  (R. at 1254.)  He reported an average pain level of seven.  (R. at 1254.)  On exam, Salyer was in moderate distress; he had positive straight leg raising on the right; intact sensation; and difficulty going from sitting to standing and with changing positions.  (R. at 1250.)  He was diagnosed with chronic low back pain with right lower extremity radiation.  (R. at 1250.)  Salyer was prescribed oxycodone, he was continued on trazodone and duloxetine and advised to take ibuprofen as needed.  (R. at 1250.)  He was advised to stop smoking and to walk.  (R. at 1250.)

On October 8, 2020, Dr. Donald Williams, M.D., a state agency physician, completed a medical assessment of Salyer, finding he could perform light work that required no climbing of ladders, ropes or scaffolds; no more than occasional climbing of ramps or stairs, stooping, kneeling, crouching or crawling; and that he should avoid concentrated exposure to vibration. (R. at 116-18.) Dr. Williams based his findings on Salyer's continued recovery from a lumbar diskectomy for degenerative disc disease.  (R. at 116-18.)

Salyer continued to receive pain medication management at the Simpson Clinic from October 2020 to January 2021. Over this time, Salyer consistently denied adverse medication side effects, and he rated his pain as being between a three and a five. (R. at 1233, 1243.) He also reported walking to and from his mother's house a couple or a few times daily. (R. at 1233, 1243.) Salyer also consistently reported that he slept well on trazodone. (R. at 1229, 1239, 1244.) In October 2020, although Salyer stated he saw Dr. Ken Smith for a second opinion, there are no such treatment notes contained in the record. (R. at 1244.) On exam, he walked with a limp; had palpable muscle spasm in the lumbar paravertebrals; had decreased sensation in the right foot; and had intact strength in all extremities. (R. at 1244.) His oxycodone was increased, and he was continued on gabapentin. (R. at 1245.) In November 2020, Salyer reported his current pain medications relieved his pain by 25 percent. (R. at 1243.) Nonetheless, he said his pain was worse than before surgery. (R. at 1244.) The increased oxycodone dosage at the last visit resulted in only a small improvement in pain. (R. at 1239.) On exam, Salyer had elevated blood pressure; his gait was stable, but he had a limp; motor tone and strength were equal; straight leg raise testing was negative; and deep tendon reflexes were 1+, bilaterally. (R. at 1239.) Oxycodone was increased, gabapentin was continued, and a 14-day trial of over-the-counter Aleve was initiated. (R. at 1240.) Salyer also was advised to use a cane or walking stick. (R. at 1240.) On December 10, 2020, Salyer reported 35 percent pain relief with medication, which was enough to make a real difference in his life. (R. at 1233.) His pain was deemed well-controlled. (R. at 1234.) On exam, he had mild paravertebral lumbar muscle spasm. (R. at 1234.) Salyer's oxycodone was refilled. (R. at 1235.) On January 15, 2021, Salyer continued to report gabapentin helped his pain, and he stated oxycodone relieved his pain by about 50 percent. (R. at 1229.) Nonetheless, he stated, "I still hurt all the time … it is getting worse." (R. at 1229.) He stated he believed his past

laminectomy was causing his pain.  (R. at 1229.)  On exam, Salyer walked with a limp.  (R. at 1229.)  He was prescribed a trial of prednisone, his gabapentin was increased, and his oxycodone was refilled.  (R. at 1230.)  Over this time, Salyer was diagnosed with lumbar laminectomy syndrome; lumbar degenerative disc disease/lumbar degenerative joint disease with exacerbation of radicular pain; and hypertension, not well-controlled.  (R. at 1230, 1235, 1245.)

On February 22, 2021, Dr. Jack Hutcheson, M.D., a state agency physician, completed a medical assessment of Salyer, finding he could perform light work, with the same postural limitations as found by Dr. Williams.  (R. at 127-29.)  Like Dr. Williams, Dr. Hutcheson also opined Salyer should avoid concentrated exposure to vibration, but he also found he should avoid concentrated exposure to hazards, like machinery and heights.  (R. at 128.)  Dr. Hutcheson also "suggest[ed] 4 hours standing/walking."  (R. at 129.)  He based his findings on Salyer's hypertension and lumbar degenerative disc disease status-post diskectomy.  (R. at 128-29.)

Salyer continued pain medication management at the Simpson Clinic from March to September 2021.  Over this time, he continued to deny adverse medication side effects, and he rated his average pain between a three and a six.  (R. at 1281, 1284, 1294, 1308, 1313.)  He also continued to report walking to and from his mother's house multiple times daily and walking around his yard with his son for exercise.  (R. at 1281, 1294, 1313.)  Trazodone continued to provide good sleep benefits.  (R. at 1268, 1284.)  In March 2021, Salyer stated he strained his back after picking up his son.  (R. at 1284.)  He reported 20 to 25 percent pain relief with pain medications.  (R. at 1294.)  On exam, Salyer had palpable paravertebral lumbar muscle spasm.  (R. at 1284.)  Amlodipine, lisinopril and Zanaflex were prescribed, and a TENS unit also was recommended.  (R. at 1285.)  On May 13, 2021, Salyer

continued to complain of chronic, moderate lumbar pain with radiation to the right leg and foot, but he stated his pain was relieved 25 percent by his medications, and he denied a need for medication adjustments. (R. at 1281.) He reported using a cane to stabilize and prevent falls. (R. at 1278.) On exam, Salyer walked with a mild limp, using a cane for support. (R. at 1278.) He was continued on oxycodone, gabapentin and trazodone. (R. at 1279.) On July 12, 2021, Salyer stated he had increased pain down the legs, worse at night, but which gabapentin helped, and Zanaflex helped his muscle spasms. (R. at 1268.) He reported narcotic therapy relieved 40 to 50 percent of his pain. (R. at 1268, 1275.) On exam, Salyer walked with a slight limp, using a cane; had palpable paravertebral lumbar muscle spasm; and had no pedal edema, bilaterally. (R. at 1268.) He was prescribed Atenolol. (R. at 1269, 1274.) On September 10, 2021, Salyer reported having increased pain that month, noting that he had been staying with his newborn son in the NICU for the past 10 days. (R. at 1308, 1313.) Salyer again reported gabapentin helped his pain, and Zanaflex helped his muscle spasms. (R. at 1308.) He reported a 20 percent decrease in average pain during the past week with pain medications. (R. at 1313.) On exam, he had palpable muscle spasm in the lumbar paravertebrals. (R. at 1308.) Oxycodone was continued, and Salyer received a Toradol injection. (R. at 1309-10.) Over this time, Salyer's diagnoses remained unchanged. (R. at 1269, 1279, 1285, 1309.)

On October 1, 2021, Salyer presented to the emergency department at Pikeville Medical Center with complaints of groin pain and abdominal swelling. (R. at 1358.) He had presented to the emergency department at Norton Community Hospital a week previously and was diagnosed with colitis, diverticulitis, a hernia and a possible hole in the bowel. (R. at 1358.) He received Flagyl and Levaquin. (R. at 1361.) Thereafter, he went to The Health Wagon and was told he had a hole

in the bowel and fluid leaking into the abdomen.[14]  (R. at 1358.)  Salyer reported difficulty urinating and having nausea with vomiting and loose stool.  (R. at 1358.)  He did not endorse myalgias or back pain at that time.  (R. at 1358.)  On exam, he had tenderness to palpation to the low abdomen, which was mildly distended; there was no extremity swelling or tenderness; there was no back tenderness; and motor strength and sensation were intact.  (R. at 1358.)  A testicular ultrasound showed simple, epididymal cysts and a left inguinal hernia.  (R. at 1319.)  A CT scan of the abdomen and pelvis showed acute sigmoid diverticulitis with a questionable early pericolonic abscess; and a left inguinoscrotal hernia.  (R. at 1321-22.)  Salyer was admitted for further evaluation and treatment of acute, complicated diverticulitis with intravenous antibiotics. (R. at 1417.)  On October 3, 2021, he saw an interventional radiologist for a consult for placement of an abscess drain.  (R. at 1433-34.) However, drainage catheter placement was unsuccessful because the fluid collection was too small.  (R. at 1570-72.)  Salyer was diagnosed with diverticulitis with microperforation and a very small fluid collection, and antibiotics were continued.  (R. at 1570.) On October 4, 2021, Salyer said he ate three pieces of pizza overnight with no increased pain, but he did have some bloating afterwards. (R. at 1438.)  His blood pressure was 155/98.  (R. at 1439.)  It was noted Salyer would follow up with general surgery as an outpatient for his hernia.  (R. at 1439.)  He was discharged on October 5, 2021, with a diagnosis of diverticulitis of the sigmoid colon.  (R. at 1440.)  At that time, his blood pressure was 145/110.  (R. at 1440.)  Salyer was instructed to follow up in two weeks with his primary care provider and in one month with general surgery.  (R. at 1440, 1450.)  He was continued on Levaquin and Flagyl, as well as a beta blocker, and instructed to perform activity as tolerated.  (R. at 1354, 1440, 1450.)

---

[14] These notes from Norton Community Hospital and The Health Wagon are not contained in the record.

On January 8, 2022, Vickie Stevens, F.N.P.-B.C., a board-certified family nurse practitioner with Southern Medical Group, Inc., performed a consultative physical evaluation of Salyer at the ALJ's request. (R. at 1579-83.) His chief complaint was two bulging discs and a spinal fracture, resulting in low back pain. (R. at 1579.) Stevens noted Salyer was ambulating with a cane. (R. at 1579.) He rated his current pain as a 6 and one-half and described it as stinging/aching in the low back, radiating down the right hip, leg and foot. (R. at 1579.) Salyer reported having fallen down due to weakness. (R. at 1579.) He said he was independent with his activities of daily living and could manage his personal care with some assistance, and he noted he had to sit down to wash dishes and could not perform yard work. (R. at 1579.) Salyer reported he had just undergone hernia surgery.[15] (R. at 1579.) He stated his current medications included oxycodone, gabapentin, trazodone, lisinopril and amlodipine. (R. at 1579.) Salyer endorsed headache, cough, abdominal pain, low back pain, knee pain, sensory loss and insomnia. (R. at 1579.) On exam, Salyer's blood pressure was 169/105; he ambulated without assistance; he had no muscle asymmetry, atrophy or involuntary movements; there was no musculoskeletal structural deformity, effusion, periarticular swelling, erythema, heat, swelling or tenderness of any joint, except as mentioned below; he had a normal gait; he could rise from a sitting position without assistance, stand on tiptoes, heels and tandem walk without difficulty; he could bend and squat without difficulty; he had full grip strength with adequate fine motor movements, dexterity and ability to grasp objects, bilaterally; there was no edema, cyanosis or erythema of the extremities; he had full muscle strength in all muscle groups, bilaterally; he had good muscle tone and normal reflexes; and sensation was intact. (R. at 1580-81.) Testing revealed Salyers had decreased range of motion in right ankle

---

[15] These surgical notes are not included in the record.

dorsiflexion, plantar flexion and internal and external rotation; and in lumbar spine flexion, extension and lateral flexion.  (R at 1581.)  Stevens opined Salyer could not sit, stand and/or walk for a full workday, lift/carry objects without limitations, hold a conversation, respond appropriately to questions and carry out and remember instructions.  (R. at 1581.)

Stevens also completed a medical assessment of Salyer's work-related abilities, opining he could occasionally lift/carry up to 10 pounds, but never more than that; sit for 30 minutes at a time, stand for 25 minutes at a time and walk for 30 minutes at a time; in an eight-hour workday, he could sit for a total of 30 minutes, stand for a total of 30 minutes and walk for a total of between two and three hours; he required a cane to ambulate, and Salyer could use his free hand to carry small objects; he could occasionally reach in all directions, handle, finger and feel with the right hand, but push/pull between never and occasionally with the right hand; he could occasionally operate foot controls, bilaterally, due to foot numbness; he could occasionally climb stairs and ramps, but never climb ladders or scaffolds, balance, stoop, kneel, crouch or crawl; he could occasionally operate a motor vehicle and work around humidity and wetness, but never work around unprotected heights, moving mechanical parts, dusts, odors, fumes and pulmonary irritants or temperature extremes; and he could frequently work around loud noise.  (R. at 1584-88.)  Stevens further opined Salyer could shop, prepare a simple meal and feed himself and care for his hygiene, but he could not travel without a companion for assistance, ambulate without using an assistive device, walk a block at a reasonable pace on rough or uneven surfaces, use standard public transportation, climb a few steps at a reasonable pace with the use of a handrail and sort, handle or use paper files.  (R. at 1589.)  Stevens opined these limitations has lasted or would last for 12 consecutive months.  (R. at 1589.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2023). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2023).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial

evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Salyer asserts that his "sole claim reflects the anomalous fact that the single decision which the ALJ issued on March 30, 2022, was the one product of two distinct hearings". (Plaintiff's Memorandum In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 7.) Despite that statement, Salyer does appear to raise other arguments, specifically, that the ALJ improperly inquired into Salyer's workers' compensation settlement and lack of health insurance and that the ALJ failed to further develop the record after finding the consultative examination unpersuasive. (Plaintiff's Brief at 7-20.)

As a preliminary matter, Salyer raised concerns that the Commissioner failed to file a "formal" motion for summary judgment in this case. (Plaintiff's Reply Brief, ("Plaintiff's Reply"), at 2.) The court notes that pursuant to Local Rule 4(c), and consistent with 42 U.S.C. § 405(g), there is no requirement for either party to file a motion for summary judgment when seeking judicial review of a final decision by the Commissioner. *See* W.D. Va. Civ. R. 4(c) (plaintiff must file a brief, the Commissioner may file a response brief, and, if so, plaintiff may file a reply brief).

Salyer's first argument is essentially that his claim should be remanded because it was unusual for the ALJ to hold two hearings in adjudicating his claim. (Plaintiff's Brief at 9.) The transcript of Salyer's first hearing is clear on why the ALJ ordered two hearings: (1) to allow more time for Salyer to obtain and submit medical records; and (2) to allow for a consultative examination to be conducted.

(R. at 72-76.) The ALJ has a duty to fully and fairly develop the administrative record. *See* 20 C.F.R. § 404.1512(b) (2023). While the ALJ will first attempt to obtain information needed to adjudicate a claim from a claimant's own medical sources, in cases where that is likely to be unproductive, the ALJ can order a consultative examination pursuant to 20 C.F.R. § 404.1512(b)(2). Salyer testified at his first hearing that, due to a lack of health insurance, he had not recently seen a doctor for his back pain. (R. at 69-71.) Because of the lack of medical records related to Salyer's current back condition, the ALJ correctly ordered a consultative examination. Notably, Salyer also requested a consultative examination at this hearing. (R. at 73.) The ALJ committed no error in conducting two hearings.

Salyer also argues that the ALJ improperly considered the consultative examiner's medical opinions. (Plaintiff's Brief at 9-12, 19-20.) Because this matter involves a claim filed on or after March 27, 2017, a new regulatory framework applies to the ALJ's evaluation of medical opinions in the record. For applications filed on or after March 27, 2017, the Social Security Administration, ("SSA"), has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)). Under the new regulations, ALJs no longer are required to assign an evidentiary weight to medical opinions or to accord special deference to treating source opinions. *See* 20 C.F.R. § 404.1520c(a) (2023) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior

administrative medical finding(s), including those from [a claimant's] medical sources").[16]

Instead, an ALJ must consider and articulate how *persuasive* he finds all of the medical opinions and all prior administrative medical findings in a claimant's case record based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. *See* 20 C.F.R. § 404.1520c(b), (c)(1)-(5) (2023) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 404.1520c(b)(1) (2023).

In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors," and, thus, the ALJ must address those two factors in evaluating the persuasiveness of medical opinions or prior administrative medical findings. 20 C.F.R. § 404.1520c(b)(2) (2023).[17] In

---

[16] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. § 404.1513(a)(2) (2023). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. § 404.1513(a)(5) (2023).

[17] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(2).

evaluating the supportability of a medical opinion, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) … the more persuasive the medical opinions … will be." 20 C.F.R. § 404.1520c(c)(1). In assessing the consistency factor, "[t]he more consistent a medical opinion(s) … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) … will be." 20 C.F.R. § 404.1520c(c)(2).

The new regulations also alter the way the ALJ discusses the medical opinions or findings in the text of the decision. *See* 20 C.F.R. § 404.1520c(b)(2). After considering the relevant factors, the ALJ is not required to explain how he considered each of them. Instead, when articulating his finding about whether an opinion is persuasive, the ALJ need only explain how he considered "the most important factors" of supportability and consistency. *See* 20 C.F.R. § 404.1520c(b)(2). The ALJ may comment on the other factors, including the source's relationship with the claimant, but generally has no obligation to do so. *See* 20 C.F.R. § 404.1520c(b)(2)-(3) (2023).

While Salyer's argument focuses largely on the consultative examiner's mental health findings, it is important to note that Salyer did not allege disability due to a mental health condition. (R. at 298.) While the ALJ did analyze Salyer's mental health conditions in his decision, the record contains limited findings regarding Salyer's mental health. The ALJ analyzed Salyer's mental health symptoms and found that his mental health conditions were nonsevere and that the consultative examiner's findings were mostly unpersuasive in this area. (R. at 15-17.)

Salyer also argues that the ALJ misrepresented the consultative examiner's role by referring to her as a "primary care provider." (Plaintiff's Reply at 3.) While the ALJ did refer to the consultative examiner's findings in his decision as resulting from a consultative examination, he initially referred to the examiner as a "primary care provider." (R. at 23.) Salyer correctly points out this mistake, but the error is unlikely to have changed the ALJ's findings for the reasons stated below.

The ALJ found that Salyer had the residual functional capacity to perform sedentary work that required no crawling or climbing ladders or scaffolds; no more than occasional stooping, crouching, and kneeling; and he required a cane for ambulation. (R. at 18.)

In making this residual functional capacity finding, the ALJ applied the new regulations. With regard to Salyer's physical limitations, the ALJ stated he found the consultative examiner's opinion "not persuasive." (R. at 24.) The consultative examiner, a nurse practitioner, evaluated Salyer in January 2022. (R. at 1579.) The examiner opined that Salyer could lift and carry 10 pounds occasionally; sit for 30 minutes at a time and 30 minutes total in an eight-hour workday; stand 25 minutes at one time and 30 minutes total; walk 30 minutes at a time and between two and three hours total; occasionally reach, handle, finger and feel with the right hand; occasionally operate foot controls, bilaterally; occasionally climb stairs and ramps; never perform other postural actions; occasionally operate a motor vehicle and work around humidity and wetness; and could never be exposed to hazards, pulmonary irritants or extreme cold. (R. at 23, 1584-89.) However, the ALJ pointed out that the limitations opined by the consultative examiner are not supported by her own findings. (R. at 23.) On physical examination, the examiner noted that Salyer had reduced lumbar and right ankle range of motion, but full strength and a normal gait,

and he was able to bend and squat without difficulty. (R. at 23.) While the consultative examiner opined that Salyer needed manipulative limitations for the right hand, this presumably was due to Salyer's use of an assistive device, as she noted that Salyer had 5/5 grip strength with adequate fine motor movements, dexterity and ability to grasp objects, bilaterally. (R. at 1580.) The ALJ noted that the record does not show chronic upper extremity issues, and Salyer was able to crawl and perform some stair climbing, stooping and crouching on his previous functional capacity evaluation ordered by Dr. Burt and completed in July 2020. (R. at 24.) The ALJ further noted that, while Salyer's lumbar fracture occurred after the functional capacity evaluation, there was no indication that Salyer would lose his ability to complete some postural activities. (R. at 24.) Neither the court nor the ALJ is permitted to infer a medical diagnosis, including symptom progression. *See Oakes v. Kijakazi*, 70 F.4th 207, 213 (4th Cir. 2023).

Here, the ALJ engaged in a proper § 404.1520b(b)(2) analysis by accepting some of the consultative examiner's findings and rejecting others based on the supportability and consistency of her findings. (R. at 23-24.) Specifically, the ALJ included that Salyer required the use of an assistive device, as noted by the consultative examiner, in his residual functional capacity finding.  (R. at 18, 1585.) The ALJ noted that the later finding of a lumbar fracture did not indicate that Salyer would entirely lose his ability to perform postural activities, which is supported by the consultative examiner's finding that he could occasionally climb stairs and ramps. (R. at 24, 1587.) The ALJ also included a limitation on lifting and carrying based on the consultative examiner's finding of hypertension. (R. at 23.) However, the ALJ noted that there is no evidence in the administrative record of a respiratory condition that would prohibit Salyer from being exposed to pulmonary irritants. (R. at 24.) While the ALJ has a duty to fully and fairly develop the administrative record,

he does not have a duty to develop the record until it produces a favorable result to the claimant. As the court in *Oakes* states, "[the court's] position is not to be understood as requiring layer upon layer of remediation – each seeking to patch the inadequacies of the last – until a claimant receives benefits." 70 F.4th at 214.

For the reasons stated above, I find that substantial evidence supports the ALJ's consideration of the consultative examiner's medical opinion.

Salyer's last argument is that the ALJ erred by inquiring into the terms of Salyer's workers' compensation settlement. (Plaintiff's Brief at 12-19.) While Salyer does not provide any support for his argument, he suggests that the ALJ's inquiry was improper. "[I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, [an ALJ] may find the alleged intensity and persistence of an individual's symptoms [] inconsistent with the overall evidence of record." Social Security Ruling, ("S.S.R."), 16-3p, 2017 WL 5180304, at *9 (Oct. 25, 2017). This Ruling also states that in considering whether a claimant has pursued treatment, an ALJ may consider if an "individual may not be able to afford treatment and may not have access to free or low-cost medical services." S.S.R. 16-3p, 2017 WL 5180304, at *10.  In this case, Salyer has alleged disability based primarily on back pain. (R. at 298.) Salyer's complaints at the hearing also centered around the continuous pain he was experiencing in his back. (R. at 66-71.) Salyer also testified that he did not pursue the third surgery that his neurosurgeon recommended because of the loss of his health insurance. (R. at 92-93.) In order to correctly analyze Salyer's symptoms, the ALJ was obligated to explore why Salyer no longer was pursuing surgical options. The ALJ noted that, despite a $200,000 workers' compensation settlement,

Salyer did not return to his neurosurgeon, nor did he obtain health insurance or pursue other financial aid alternatives for the recommended surgery. (R. at 22-23.) Instead, the ALJ noted that Salyer began seeing a pain management provider, but he did not otherwise indicate that he was doing anything else to manage his symptoms. (R. at 23.) While Dr. Burt never approved Salyer to return to work, his approval was based on Salyer returning to his previous job as a miner and on an expected third surgery, during which time Salyer would remain under his medical care. (R. at 1216.) The ALJ found that Salyer was unable to perform his past relevant work, which was classified as very heavy under the regulations, as he found Salyer retained the ability to perform sedentary work, the requirements of which Dr. Burt had not considered when writing his work restriction. (R. at 18, 24.)

For all the above-stated reasons, I find that substantial evidence exists to support the ALJ's consideration of the consultative examiner's medical opinion, his inquiry into the terms of Salyer's workers' compensation settlement and his ultimate finding that Salyer had the residual functional capacity to perform sedentary work.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's consideration of the opinion evidence of the consultative examiner;

2. The ALJ's inquiry into the terms of Salyer's workers' compensation settlement was proper;

3. Substantial evidence exists in the record to support the ALJ's

residual functional capacity finding; and

4. Substantial evidence exists in the record to support the Commissioner's finding that Salyer was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Salyer's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time at this time.

DATED:    March 13, 2024.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE